196 Cal.App.3d 675 (1987)
241 Cal. Rptr. 869
In re JAMIE G., a Person Coming Under the Juvenile Court Law.
PEDRO SILVA, as Chief Probation Officer, etc., Plaintiff and Respondent,
v.
HAZEL G. et al., Defendants and Appellants.
Docket No. H001738.
Court of Appeals of California, Sixth District.
November 24, 1987.
*677 COUNSEL
Deanna F. Lamb and Robert Fiedler, under appointments by the Court of Appeal, for Defendants and Appellants.
Leo Himmelsbach, District Attorney, and Robert J. Masterson, Deputy District Attorney, for Plaintiff and Respondent.
OPINION
CAPACCIOLI, J.
This case presents the issue of what rights should be accorded the conceded de facto parents of a dependent child. Appellants Hazel and Jerry G., who are unrelated biologically to Jamie but are her psychological or de facto parents, urge this court to conclude that they should be afforded the same rights as Jamie's biological parents. Respondent argues that de facto parents are not parents or guardians for the purposes of article 10 of the Juvenile Court Law. We decline to equate the two for this purpose and therefore affirm the juvenile court's order.
Jamie's biological mother lived with appellants while she was pregnant. She apparently had no interest in raising the child, for whom appellants agreed to care after its birth. The biological mother obtained prenatal care and entered the hospital for the baby's birth using Hazel's name. On Jamie's birth certificate, Hazel's name appears as that of her biological mother. Two days after Jamie's birth, she was released to Hazel from the hospital. The mother then left the area. She has apparently had no contact with Jamie since this time, and her present whereabouts are unknown.
Jamie lived with appellants for the next three and a half years, until January 1985. On December 31, 1984, the probation department (Department) received a referral from the person who was providing care for Jamie while appellants apparently had no suitable habitation for her. Jamie's care provider was suspicious that Jamie had been sexually molested. Jamie was placed in protective custody on January 9, 1985.
On January 11, 1985, the Department filed a Welfare and Institutions Code section 300, subdivision (a) petition. The petition was sustained at a jurisdiction hearing on March 13, 1985. The Department report filed for the April 2, 1985, disposition hearing revealed the facts of Jamie's birth and that Hazel was not her biological mother. Jerry, however, still claimed to be Jamie's biological father. The report stated that there was nothing to *678 substantiate the suspicion that Jamie had been molested but that it appeared Jamie had "observed" considerable sexual activity by other adults in appellants' household. It also indicated that appellants had abused alcohol, that Jerry, age 41, had a record of five alcohol-related arrests, an arrest for welfare fraud and a sporadic employment record and that Hazel, age 47, had two previous alcohol-related arrests and a welfare fraud conviction.
At the disposition hearing, the juvenile court adjudicated Jamie a dependent child and ordered her foster placement. It ordered Jerry to submit to blood tests to determine Jamie's paternity, and ordered appellants to obtain marriage counseling, to abstain from the use of alcohol and to maintain an adequate living environment without other adults. A six-month review was set for September 11, 1985.
On May 23, 1985, appellants signed a reunification plan agreement which was to extend to September 2, 1985. On July 24, 1985, Jamie was placed in a foster-adoptive home with foster parents who wish to adopt her.:GP5
On August 6, 1985, Hazel filed a petition for modification under Welfare and Institutions Code section 388 to "review the intent of the Reunification Plan" of April 2, 1985, and to request a change in the visitation schedule. A hearing on this petition was continued until after psychological evaluations of Jamie, appellants and Jamie's foster parents had been completed. The hearing was eventually consolidated with the permanency planning hearing which was held on January 17 and 29, and February 26, 1986.
The psychologist's report, dated November 25, 1985, first noted that Jerry G.'s claim that he was Jamie's biological father had been refuted by blood tests. It concluded that Jamie had been "reared in a setting of emotional depriviation [sic] in her early years." The report recounted the history of "significant alcohol abuse, violence and unstable living conditions" in appellants' marriage and cited the prior arrests of both appellants on felony counts and Jerry G.'s chronic unemployment and alcohol abuse. Although Jamie appeared relaxed and comfortable when observed both with appellants and with her foster parents, she displayed some anxiety about appellants. The report concluded that appellants "conjointly as a couple or as individuals are not able to meet Jamie's needs for proper care and nurturing." It noted Jamie's positive progress toward age appropriate behavior while in her present foster home and stated that although she had attachments both to appellants and to her foster parents, her best interests would be served by freeing her for adoption by the foster parents. Any emotional risk to Jamie from severing her bonds to appellants, the report concluded, would be "more than compensated for by the continuation of the consistent *679 stability and superior nurturance that has been available to her in the [foster] household."
There was also evidence presented at the permanency planning hearing, however, that Hazel had separated from Jerry and had substantially complied with the requirements of the reunification plan. Hazel then argued that she should stand in the shoes of the biological mother and that the court should allow her, pursuant to section 366.2, subdivision (e), an additional six months of reunification services. Respondent argued that since Hazel did not come under the statute, she should be allowed no further time. The court stated: "If, in fact, I [were] to treat Mrs. G[.] as a natural and biological parent, at this point, based on the evidence that has been presented, I would be finding that there is a substantial probability that reunification would occur in six months.... I do feel that Mrs. G[.] has substantially complied with the service plan presented, and ... there is a substantial probability that within six months with an appropriate service plan that the court would be in a position where Jamie and Mrs. G[.] perhaps would be reunified. Certainly if she [were] coming before the court as a natural parent, I believe I would give her that additional six months based on the evidence presented. I don't feel, at this point, she has an alcohol problem that is currently debilitating in terms of her ability to parent.... [S]he has initiated and is in the process of developing a therap[e]utic relationship that may, in fact, render her capable of parenting Jamie within a specified period of time." The court refused to allow Hazel additional time for reunification, however, in light of the fact that she was not Jamie's biological mother. Since it found that returning Jamie to Hazel at the time of the hearing would be detrimental to Jamie, the court ordered her continued in foster placement and allowed Hazel continued visitation. She also ordered county counsel to file a termination petition as to the natural mother. This appeal ensued.
(1a) The issue posed by appellants is a narrow one: whether de facto parents are entitled to the opportunity to reunify with a child which would have been accorded a parent or guardian under section 366.2, subdivision (e) and whether the denial of this opportunity amounts to a deprivation of due process.[1] We cannot answer this question, however, without considering appellants' rights in the dependency proceeding and, more fundamentally, the nature of their relationship with Jamie. Viewed in this broad perspective, the answer to the question posed in this appeal must be no.
We cannot ignore the nature of appellants' custody of Jamie prior to the dependency proceedings, since it has an effect on the rights to which they *680 are entitled therein. Not only have they no biological relationship to Jamie, but their custody of her has been sanctioned in no other manner. They are not Jamie's parents by virtue of having adopted her (cf. Civ. Code, § 228), nor have they applied to be her adoptive parents. They have no contractual relationship with the state to provide for her care, as do foster parents. They are not, nor have they petitioned to be, Jamie's guardians. (cf. Prob. Code, § 1510.) We do not minimize the importance of appellants' psychological ties to Jamie, nor of their role in her life. The fact remains, however, that they did not have legal custody of Jamie. And their relationship with her is not accorded the status, nor does it enjoy the rights, of one sanctioned either by the existence of blood ties or established or approved in law.
The nature of appellants' relationship with Jamie fundamentally affects our analysis of their rights in the dependency proceedings. The Juvenile Court Law establishes a procedure to protect the due process rights of parents or guardians who have failed to adequately provide for their children or otherwise abused or neglected them. This, in turn, is based on an acknowledgement that biological relationships involve essential or fundamental rights. (See, e.g. Stanley v. Illinois (1972) 405 U.S. 645, 651 [31 L.Ed.2d 551, 558-559, 92 S.Ct. 1208].) Since adoption is the legal equivalent of biological parenthood (Civ. Code, § 228) the due process protections of this law are also extended to adoptive parents. Since a guardian has legal responsibility for the care, custody and control of his or her ward (see Prob. Code, § 2351 et seq.) the Legislature has seen fit to extend these protections to guardians as well as to parents.
Since appellants' relationship with Jamie falls under none of these classifications, we have no difficulty concluding that the dependency statutes, per se, do not apply to protect their due process rights. The question then remains what, if any, process they were due given their status as Jamie's de facto or psychological parents.
The California Supreme Court, in In re B.G. (1974) 11 Cal.3d 679 [114 Cal. Rptr. 444, 523 P.2d 244], considered the question of what process was due foster parents who were also the de facto or psychological parents of the dependent children in that case. (2) The court recognized that the interest of foster parents in their relationship with the child or children in their charge is a substantial one which deserves protection under the law. (Id. at pp. 692-693.) It held that the foster/de facto parents should be permitted standing to appear as parties to the juvenile court proceeding "to assert and protect their own interest in the companionship, care, custody and management of the child." (Id. at p. 693, fn. omitted.) It noted that the status of the de facto parent had received statutory sanction with the enactment of the Family Law Act in 1969, since Civil Code section 4600, subdivision (c) *681 establishes a custodial preference for the home of a de facto parent when an award of custody to a parent would be detrimental to the child. The court specifically declined to hold, however, that a de facto parent is a parent or guardian as these terms are used in the Juvenile Court Law. (Id. at p. 693, fn. 21.)
Since B.G., the appellate courts of this state have reiterated a foster parent/de facto parent's right to standing in juvenile dependency proceedings. (See, e.g., Christina K. v. Superior Court (1986) 184 Cal. App.3d 1463 [229 Cal. Rptr. 564]; Charles S. v. Superior Court (1985) 168 Cal. App.3d 151 [168 Cal. Rptr. 151, 214 P.2d 47] [maternal grandfather of a dependent child in foster care accorded the status of de facto parent and standing to appear as a party in his grandson's dependency proceedings]; Guardianship of Phillip B. (1983) 139 Cal. App.3d 407 [188 Cal. Rptr. 781] [guardianship of a 14-year-old mentally retarded boy awarded his de facto parents, on showings that even though he did not live with them full time they were his psychological parents, and that retention of custody by the biological parents would have been detrimental to him].) No case, however, sheds light on the question of what, if any, process is due in dependency proceedings to de facto parents who are unrelated by blood or legal ties to the child, or on their right to be accorded reunification services that would be mandated for the child's parents or guardians.
Although many cases have discussed the nature and extent of foster parents' rights, we are not persuaded that these cases should be dispositive here. In Smith v. Organization of Foster Families (1977) 431 U.S. 816 [53 L.Ed.2d 14, 97 S.Ct. 2094] (Smith v. OFFER), the United States Supreme Court considered claims by individual foster parents and an organization of foster parents that the statutory and regulatory procedures by which the State of New York removed foster children from their homes violated constitutional guarantees of due process and equal protection. The foster parents contended that when the foster family became the child's psychological family, they had a liberty interest in the survival of the foster family protected by the Fourteenth Amendment. (Id. at p. 839 [53 L.Ed.2d at p. 31].) The Supreme Court questioned whether the foster parent-foster child relationship was sufficiently akin to the concept of family to merit this protection. The court recognized that "At least where a child has been placed in foster care as an infant, has never known his natural parents, and has remained continuously for several years in the care of the same foster parents, it is natural that the foster family should hold the same place in the emotional life of the foster child, and fulfill the same socializing functions, as a natural family. For this reason, we cannot dismiss the foster family as a mere collection of unrelated individuals. [Citation.]" (Id. at pp. 844-845 [53 L.Ed.2d at p. 35], fn. omitted.) It noted, however, that there were significant *682 differences between the foster family and the natural family, since New York statutes and foster parent contracts both assumed that a foster placement would be temporary and that the child would be returned to his or her natural parents. (Id. at pp. 845-846 [53 L.Ed.2d at p. 36].)
The Supreme Court found it unnecessary to resolve the extent of the liberty interest involved, however. Noting that "`[D]ue process is flexible and calls for such procedural protections as the particular situation demands[,]'" (Smith v. OFFER, supra, 431 U.S. 816 at p. 848 [53 L.Ed.2d at p. 38], quoting Morrissey v. Brewer (1972) 408 U.S. 471, 481 [33 L.Ed.2d 484, 494, 92 S.Ct. 2593]) it concluded that, even on the assumption that a liberty interest existed, the state's preremoval procedures passed constitutional muster. (Id. at p. 847 [53 L.Ed.2d at p. 37].)
Cases since Smith v. OFFER have generally agreed that where foster care is designed either by statute or by contract to be a temporary arrangement, foster parents do not have a constitutionally protected liberty interest in the continued custody of their foster children. (See, e.g., Drummond v. Fulton Cty. Dept. of Family, Etc. (5th Cir.1977) 563 F.2d 1200, en banc, cert. den. 437 U.S. 910 [57 L.Ed.2d 1141, 98 S.Ct. 3103]; Kyees v. County Dept. of Public Welfare (7th Cir.1979) 600 F.2d 693; Backlund v. Barnhart (9th Cir.1985) 778 F.2d 1386; Sherrard v. Owens (W.D.Mich. 1980) 484 F. Supp. 728, judg. affd. 644 F.2d 542, cert. den. 454 U.S. 828 [70 L.Ed.2d 103, 102 S.Ct. 120]; Crim v. Harrison (N.D.Miss. 1982) 552 F. Supp. 37.)
Arguably, however, appellants expected a lasting relationship with Jamie. And where foster parents have reason to expect a lasting relationship with their foster children, the case law is decidedly more equivocal on whether a protected liberty interest is involved. (See, e.g., Berhow v. Crow (Fla.App. 1982) 423 So.2d 371 [licensed foster parents who challenge adoption by maternal grandparents have constitutionally protected liberty interest where natural mother requested that foster parents raise child, mother and maternal grandparents signed consent, and child lived with foster parents all her life]; In Interest of R.K.W. (Mo. App. 1985) 689 S.W.2d 647 [preremoval due process mandated for unlicensed foster parents, legal custodians of dependent child since she was four months old]; Brown v. County of San Joaquin (E.D.Cal. 1985) 601 F.Supp 653 [foster mother entitled to preremoval procedural due process since California law creates the expectation, once reunification efforts had been abandoned, that a foster family relationship of significant duration would be protected from arbitrary destruction]; Rivera v. Marcus (D.Conn. 1982) 533 F. Supp. 203 [foster mother/half sister to two children placed with her by natural mother entitled to preremoval due process].)
*683 Appellants were not selected by and did not contract with the state to provide care for Jamie, however. They thus do not stand in the same shoes as any of these foster parents, and the considerations pertinent to the result in these latter cases do not obtain here.
The only truly parallel case to that before us is James v. McLinden (D.Conn 1969) 341 F. Supp. 1233, which was decided before either In re B.G., supra, 11 Cal.3d 679 or Smith v. OFFER, supra, 431 U.S. 816. As in this case, the appellant in James was the de facto parent of a "give away" child to whom she was not related biologically. When Connecticut commenced neglect proceedings concerning the child, she received no notice of the proceedings. Neither she nor her attorney was allowed to appear in the case, and both were refused admittance to the courtroom. The court clerk even refused to allow appellant to file an appeal from the court's order finding the child neglected. (James v. McLinden, supra, 341 F. Supp. at pp. 1234-1235.) The federal district court in James concluded that "no sound reason [existed] to deny a person who has voluntarily assumed the obligations of parenthood over a child the same basic rights to due process a natural or legal parent possesses when the state intervenes to disrupt or destroy the family unit." (Id. at p. 1235.) Although it warned appellant that its holding did not bar the state from further action to ensure the child's welfare, the court held that in any further proceedings, appellant was entitled to the "same rights" as a natural or legal parent. (Id. at pp. 1235-1236.)
James stands for the proposition, as do the previous cases concerning foster parents with expectations of a lasting relationship with their foster children, that one with significant ties to a child should be afforded procedural due process in proceedings regarding that child. Even were we to accept this proposition at face value, however, we need not decide the extent of the process due appellants in light of the record in this case.
From the time Jamie was taken into protective custody in January 1985 until the permanency planning hearing in January and February 1986, although by statute they were entitled to none of these rights, appellants were treated precisely as if they had been Jamie's biological parents. They received notice, were represented by counsel, and were parties to the dependency proceedings. They testified, presented evidence on their behalf and had an opportunity to confront and cross-examine witnesses. They were afforded visitation rights with Jamie and reunification services from the county. No case persuades us that, on this record, appellants were not afforded ample procedural due process in this proceeding.
(1b) We come then, finally, to the narrow question posed by this appeal; whether, in distinguishing between appellants and parents or guardians for *684 the purposes of section 366.2, subdivision (e), the juvenile court violated appellants' due process rights. The answer to this must be an unequivocal negative. The statute identifies those to whom, by virtue of the nature of their relationship with the dependent child, further reunification services may be extended. As we have already discussed, appellants simply do not fit the bill. Although the inception of their relationship with Jamie may have sprung from kindness and affection, it has been sanctioned neither by birth nor by law. The statutes do not provide, and we will not hold, that de facto parents should be considered parents or guardians for the purpose of section 366.2, subdivision (e). Nor will we hold, on the record before us, that distinguishing between biological and de facto parents for this narrow purpose violated appellants' rights to procedural due process in this case.
Only the legislature may decide which classes of caretaker should be afforded opportunities to reunify with a child who is removed from their custody. But it is unfortunate that respondent led appellants to believe, from the inception of Jamie's dependency to the time of the permanency planning hearing, that they would be treated as if they were Jamie's natural parents, and that only at that juncture were appellants disabused of such expectation. It is apparent to us that, based on the psychologist's report of November 1985 questioning appellants' abilities to meet Jamie's needs and stating that Jamie was flourishing in her foster adoptive placement, respondent decided prior to the permanency planning hearing in January and February 1986, that it would no longer support efforts to reunify Jamie with appellants and that freeing Jamie for adoption would better meet her best interests.
By that time Hazel had made tremendous gains towards having Jamie returned to her custody, and suddenly the rules were changed. Respondent's course of conduct made light of Hazel's expectations that, if she continued to make gains of the kind she had already demonstrated, she would be reunited with a child whom she had cared for since her birth, whom she obviously loves, and who was still bound to her.
Appellants also complain that the court's finding of detriment is not supported in the record. Since we have held that appellants are not parents or guardians for the purpose of article 10 of the Juvenile Court Law, we also conclude that this finding is not required for the purpose of section 366.2, subdivision (e). We will address this argument, however, in light of the custodial preference established in Civil Code section 4600, subdivision (b)(2), for the custody of the person or persons in whose home the child has been living in a "wholesome and stable environment," if a child cannot be returned to the custody of his or her parent or parents, and of the requirement in subdivision (c) that the court find, before awarding custody to a *685 nonparent, that the award of custody to a parent would be detrimental to the child. Even were appellants to be considered Jamie's parents for the purpose of this statute, and we expressly do not hold that they should, the juvenile court's finding that Jamie should not be returned to Hazel's custody at the time of the permanency planning hearing is supported by substantial evidence in the record. (In re Angelia P. (1981) 28 Cal.3d 908 [171 Cal. Rptr. 637, 623 P.2d 198].)
Evidence was presented at the permanency planning hearing that Hazel had made substantial progress toward complying with the court-ordered reunification plan. Some of this progress, however, was of short duration. Although Hazel had separated from and was in the process of seeking a dissolution from Jerry, this process was incomplete at the time of the hearing. She had only recently established a therapeutic relationship or maintained a suitable place of abode. While it was evident that Hazel's progress toward completing the service plan had been substantial, it is also apparent that the court did not consider her gains of sufficient duration to be convinced that Jamie should be returned to her at that point. In addition, the psychologist's report questioned whether either Jerry or Hazel could meet Jamie's needs for proper care and nurturing and indicated that she had made substantial progress toward appropriate behavior in her foster home. On this record, even had a finding of detriment been required, we would find it supported by substantial evidence in the record.
The court's order is affirmed.
Agliano, P.J., and Brauer, J., concurred.
Petitions for a rehearing were denied December 11, 1987, and appellants' petitions for review by the Supreme Court were denied February 24, 1988.
NOTES
[1] We note that this narrow issue, in light of the juvenile court's finding that only Hazel had substantially complied with the reunification service plan, pertains only to Hazel and not to Jerry.