[No. S029210. Oct. 28, 1993.]

In re KIESHIA E., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY DEPARTMENT OF SOCIAL SERVICES,
Plaintiff and Respondent, v.
CHERIE WILLIAMS, Defendant and Respondent;
DERRICK CHAPPLE, Intervener and Respondent;
KIESHIA E., Appellant.

### COUNSEL

Robert D. Frank, under appointment by the Supreme Court, Katherine A. Yesson and Frank, Ayers and Larsen for Appellant.

Lloyd M. Harmon, Jr., County Counsel, Susan Strom, Chief Deputy County Counsel, and Gary C. Seiser, Deputy County Counsel, for Plaintiff and Respondent.

Lynne G. McGinnis, under appointment by the Supreme Court, for Defendant and Respondent.

Susan Cardine, under appointment by the Court of Appeal, and James G. Dunn for Intervener and Respondent.

### OPINION

**BAXTER, J.**—In *In re B. G.* (1974) 11 Cal.3d 679 [114 Cal.Rptr. 444, 523 P.2d 244], this court established an important rule of procedure for child

custody and dependency cases. We held that one who is not the child's parent or legal custodian, but who has become a "de facto parent" by assuming that daily role over substantial time, may be privileged to participate as a party to the court proceedings. We must now decide whether a nonparent may attain this privilege in proceedings which have adjudged a minor to be a juvenile court dependent because of sexual or other serious physical abuse committed by the nonparent. We conclude that the answer is "no."

## FACTS

Cherie Williams began living with Derrick Chapple in May 1989. Their daughter Desiree was born in November 1989. Kieshia E., born to Cherie and another man, Curtis E., in May 1987, was also living with the couple.

On June 11, 1991, Cherie brought Kieshia to the University of California at San Diego Medical Center (UCSD) for treatment of a persistent vaginal irritation. There she was examined by doctors and interviewed by hospital social workers.

Based on information thus obtained, the San Diego County Department of Social Services (County) filed a petition, dated June 13, 1991, alleging that Kieshia was a person within the jurisdiction of the juvenile court because Derrick had molested her "on or about and between 9-1-90 and 6-11-91," and she was in substantial danger of further abuse. (Welf. & Inst. Code, § 300, subd. (d).)[1] A "sibling" petition was contemporaneously filed on behalf of Desiree. (*Id.*, subds. (d), (j).)[2]

At a June 14 detention hearing, the court appointed counsel for Cherie, Derrick (as the father of Desiree), both children, and Kieshia's father, Curtis. The court then found prima facie evidence that both minors were persons described in section 300, and that their immediate removal from Cherie's custody, pending a jurisdictional hearing, was necessary to avoid substantial danger to their physical health. (§ 319, subd. (a).)

The court ordered interim custody to be with the County, specified liberal visitation rights for Cherie, and gave the County discretion to place the

[1]Welfare and Institutions Code section 300 provides in pertinent part that "[a]ny minor who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: [¶] . . . [¶] (d) The minor has been sexually abused, or there is a substantial risk that the minor will be sexually abused, . . . by his or her parent or guardian or a member of his or her household . . . ." All further section references are to the Welfare and Institutions Code unless otherwise indicated.

[2]Section 300, subdivision (j) brings within juvenile court jurisdiction a minor whose sibling has been abused or neglected if "there is a substantial risk that the minor will [also] be abused or neglected . . . ."

minors with Cherie under certain circumstances. Derrick was ordered to move from Cherie's residence and avoid contact with the children. The County placed Kieshia and Desiree in foster care.

The jurisdictional hearing was held on September 5. (§§ 345-356.) Cherie, Derrick, and Curtis were present with counsel. Appointed counsel for the minors was also in attendance. Without objection from any counsel, the County rested after offering in evidence its "Detention Information/Jurisdictional Facts/Readiness Report" dated June 14, 1991, and its social study dated July 16, 1991. (See §§ 281, 355; *In re Malinda S.* (1990) 51 Cal.3d 368 [272 Cal.Rptr. 787, 795 P.2d 1244].)

According to these documents, Kieshia was treated at various times between September 1990 and June 1991 for persistent vaginal irritation. On June 11, 1991, she complained again to Cherie that her "potty" (vagina) hurt. At UCSD, Dr. Dorfman found inflammation of the vaginal area, but no tears or discharge. The physical examination could neither confirm nor "rule out molest."

In Cherie's presence, Dr. Dorfman asked Kieshia about touching problems. Kieshia first said she could not "tell" but then stated that "Daddy" (her name for Derrick) touched her "potty" with his hands and penis.[3] Dr. Dorfman contacted the hospital's social worker, Linda Newsum.

While Dr. Dorfman was out of the room, Kieshia told Cherie that "Daddy choked me. . . . [H]e put his potty in my mouth and it felt like it was making another hole in my throat." Kieshia said it happened while Cherie was at the grocery store and at Derrick's "work." When Cherie asked if Derrick had threatened her, Kieshia replied that "[h]e said he'd cut my head off."

Newsum arrived and interviewed Kieshia privately. Kieshia said sometimes she did not like her "Daddy" because he touched her "potty" with his hand and also touched her with his "potty." This happened, according to Kieshia, in Cherie's bed, but Cherie did not know about it. Kieshia demonstrated her claims by unzipping the pants of an anatomically correct male doll and touching its penis. Kieshia indicated Derrick had molested her more than once, but she could provide no specific times.

Cherie confirmed to social workers that opportunities for molestation such as those described by Kieshia could have arisen. Cherie also told them she had to believe Kieshia's accusations because the "details [were] too much for her to have made up."

---

[3] Kieshia's father, Curtis, was in prison during this period.

When interviewed by County workers about Kieshia's claims, Derrick responded, "You gonna believe a four-year-old over me?" He also suggested that perhaps the children should not return home because "the perpetrator may be in the [housing] complex."

Derrick called several witnesses at the September 5 hearing. Cherie testified that Kieshia had made no previous accusations, and that Kieshia's vaginal problems began before Cherie met Derrick. Cherie said Derrick had sometimes undertaken the task of applying prescribed medicinal creams to the genital areas of both children. Kieshia had said once or twice that she did not want to stay home with "Daddy," but Cherie ascribed no sinister significance to this. Cherie admitted she was "stuck in the middle" between her loyalty to Derrick and her inclination to believe her daughter.

Derrick's friend, sister, and mother each testified that Kieshia related well to Derrick as a father figure. These witnesses saw no evidence of tension or fear in the relationship. Kieshia never told them Derrick had molested her.

Testifying in his own behalf, Derrick denied abusing Kieshia. He conceded he was often home alone with the children. He also confirmed, as Cherie had suggested, that he applied medicinal creams to Kieshia's vaginal area on many occasions.

Following the hearing, the court found by a preponderance of evidence (§ 355) that the allegations of the petitions were true.[4] The court therefore concluded that Kieshia and Desiree were persons described by section 300.

On November 26, 1991, the date set for the dispositional hearing, Derrick applied to intervene as Kieshia's de facto parent. The court deferred the application and proceeded with disposition.

According to the additional information report considered by the court (see § 358, subd. (b)), Derrick's psychological tests suggested "patterns seen in known child molesters." The report also indicated that Kieshia could distinguish between Derrick and her real father, and that she wanted visits with Curtis.

The court adjudicated the children dependents of the juvenile court and placed them with Cherie. Cherie and Curtis were directed to participate in a family reunification plan with respect to Kieshia. Cherie and Derrick were

---

[4]The court commented that Kieshia did not appear to be an "eroticized" child, that she disliked Derrick's actions but did not understand their sexual significance, and that she had no motive to lie. In the court's view, these considerations bolstered her credibility.

given similar orders with respect to Desiree. (§§ 360, subd. (c), 361.3, 361.5.)

Derrick's de facto parenthood hearing took place on December 19, 1991, and January 10, 1992. Cherie and others testified that Derrick had provided parental care to Kieshia and that they had a positive relationship akin to parent and child.

Clinical psychologist Raymond Murphy testified about how a child bonds with a "psychological" parent. Dr. Murphy indicated that molestation by such a person might or might not damage the child or destroy the bond. While victim and abuser should be separated until the perpetrator "stabilizes" in therapy, Dr. Murphy said, the ultimate goal should be reunification, especially if the child has been separated from siblings.

Kieshia's therapist and social worker testified that their conversations with her after the molestation indicated she distrusted Derrick, understood who her real father was, did not see Derrick in that role, was "confused" and "hurt" by what Derrick had done, and did not want contact with him. Similar information was provided in an additional information report prepared by the County.

At the conclusion of the hearing, the court ruled that Derrick had established a bond of psychological parenthood with Kieshia, and that there was insufficient evidence this bond had been severed by the molestation. Accordingly, the court granted Derrick's application for party status in Kieshia's case as her de facto parent.

Kieshia appealed this order, and the Court of Appeal affirmed. We granted review to determine whether a child abuser may ever intervene as the victim's de facto parent in proceedings which arose from the abuse. We now answer that question in the negative.[5]

---

[5]The County, as petitioner in the underlying dependency proceeding, supports Kieshia's position that Derrick's misconduct rendered him ineligible for de facto parent standing. Cherie filed a brief in support of Derrick's and the Court of Appeal's position that the trial court correctly granted him standing.

After we granted review, both Cherie and Derrick died, and the appeal therefore became technically moot. After soliciting the views of counsel, we nonetheless decided to retain the matter because the issue presented is one of continuing public importance. (See, e.g., *Abbott Ford, Inc.* v. *Superior Court* (1987) 43 Cal.3d 858, 868-869, fn. 8 [239 Cal.Rptr. 626, 741 P.2d 124]; *Johnson* v. *Hamilton* (1975) 15 Cal.3d 461, 465 [125 Cal.Rptr. 129, 541 P.2d 881], and cases therein cited.) Derrick's counsel, San Diego Attorney James G. Dunn, failed to appear for oral argument, but argument in support of the trial court's order was presented by Cherie's counsel.

## DISCUSSION

In *In re B. G.*, *supra*, 11 Cal.3d 679, the children of a Czechoslovakian refugee were declared dependent and placed in foster care after the death of their father. Over two years later, their mother, who was still in Czechoslovakia, learned of the dependency proceedings and intervened to obtain the children's return. The juvenile court allowed the foster parents to participate as parties in the dispositional proceedings because they had filed a guardianship application. The court denied the mother custody and continued their foster care, deeming this to be in their "best interest."

The mother appealed, contending primarily that the standards applied by the trial court had failed to consider the preference for custody by parents. This court agreed and reversed the trial court's dispositional order.

We also decided to "briefly" clarify "the standing of the foster parents in this litigation." Contrary to the juvenile court, the Court of Appeal had ruled that the foster parents were not parties, but it permitted them to argue as amici curiae. After granting hearing, we had followed the same practice. However, our opinion took a different tack.

Alluding to a recent book on custody policy, we observed that a nonparent who has undertaken the parental role on a day-to-day basis, "seeking to fulfill both the child's physical needs and his psychological need for affection and care[, may become the child's de facto parent]. (See Goldstein, Freud, & Solnit, Beyond the Best Interests of the Child (1973) p. 98.)" (*In re B. G.*, *supra*, 11 Cal.3d at p. 692, fn. 18.) We concluded that one who "assumes the role of parent, raising the child in his own home," may, in time, acquire an "interest" which is "substantial" in the " 'companionship, care, custody, and management' " of the child. (*Id.*, at p. 692.)

The participation of interested de facto parents in custodial litigation promotes correct disposition, we reasoned, because "such persons who have experienced close day-to-day contact with the child" are among the custodial alternatives the court must appraise, and their views "deserve consideration." (*In re B. G.*, *supra*, 11 Cal.3d at p. 693.) Indeed, we noted, when parental custody would be "detrimental" to a child, the Family Law Act gives next custodial preference to "the person or persons in whose home the child has been living in a wholesome and stable environment." (*Ibid.*, quoting Civ. Code, § 4600, subd. (b)(2).)

Hence, we concluded, de facto parents should be permitted "to appear as [full] parties," not mere amici curiae, in a juvenile dependency proceeding.

Their standing, we stressed, does not depend upon pending guardianship applications. Rather, we held, the fact of de facto parenthood alone should entitle them to intervene and protect their "own interest" in the child's care and custody. (*In re B. G., supra*, 11 Cal.3d at p. 693.)

Within its limited scope, the doctrine of de facto parenthood has since been liberally applied to ensure that all legitimate views, evidence, and interests are considered in dispositional proceedings involving a dependent minor. (See, e.g., *In re Joshuia S.* (1988) 205 Cal.App.3d 119, 125 [252 Cal.Rptr. 106] [de facto parenthood may be established by preponderance of evidence]; *Christina K. v. Superior Court* (1986) 184 Cal.App.3d 1463, 1466-1469 [229 Cal.Rptr. 564] [time during which parental role was assumed is not dispositive where intervener has substantial interest or information to contribute]; *Charles S. v. Superior Court* (1985) 168 Cal.App.3d 151, 156-157 [214 Cal.Rptr. 47] [concerned grandparent who was not de facto parent should have been allowed to participate and present evidence].) The Judicial Council has included the doctrine in the Juvenile Court Rules. (See Cal. Rules of Court, rules 1401(a)(4), 1412(e).)[6] ■ With one exception, however, nothing in these cases or rules suggests that an *abusive nonparent* retains independent rights or interests concerning the care and custody of the victim which entitle the nonparent to standing.

■ Our society does recognize an "essential" and "basic" presumptive right to retain the care, custody, management, and companionship of *one's own child*, free of intervention by the government. (See, e.g., *Stanley v. Illinois* (1972) 405 U.S. 645, 651 [31 L.Ed.2d 551, 558-559, 92 S.Ct. 1208]; *Lassiter v. Department of Social Services* (1981) 452 U.S. 18, 27 [68 L.Ed.2d 640, 649-650, 101 S.Ct. 2153]; Civ. Code, §§ 232 et seq., 4600, subd. (c), 7000 et seq.; Welf. & Inst. Code, § 361 et seq.) Maintenance of the familial bond between children and parents—even imperfect or separated parents—comports with our highest values and usually best serves the interests of parents, children, family, and community. Because we so abhor the involuntary separation of parent and child, the state may disturb an existing parent-child relationship only for strong reasons and subject to careful procedures.

Of course, sexual or other serious physical abuse of a child by an adult constitutes a fundamental betrayal of the appropriate relationship between

---

[6]Rule 1401(a)(4) defines a de facto parent as "a person who has been found by the court to have assumed, on a day-to-day basis, the role of parent, fulfilling both the child's physical and psychological needs for care and affection, and who has assumed that role for a substantial period; . . ." Rule 1412(e) provides that "[u]pon a sufficient showing the court may recognize the child's present or previous custodians as de facto parents and grant standing to participate as parties in disposition hearings and any hearing thereafter at which the status of the dependent child is at issue."

the generations. We recently observed in another context that child moles-
tation is among those acts "so inherently harmful that the intent to commit
the act and the intent to harm are one and the same. . . ." (*J. C. Penney
Casualty Ins. Co.* v. *M. K.* (1991) 52 Cal.3d 1009, 1026 [278 Cal.Rptr. 64,
804 P.2d 689].) When a parent abuses his or her own child, or permits such
abuse to occur in the household, the parent also abandons and contravenes
the parental role. Such misparenting is among the specific compelling
circumstances which may justify state intervention, including an interruption
of parental custody. (See § 300, subds. (d), (e), (j).)

Even when one so seriously violates parental responsibilities, however,
the strong countervailing interests unique to the status of parent must still be
considered. A mere finding of parental abuse does not sever the legal and
familial bond between parent and child. The Juvenile Court Law restricts
judicial power to remove a child from the care and society of even an
abusive or abuse-tolerant parent. (§§ 319, subd. (d), 360, 361, subd. (b).) If
separation is necessary, reunification must be encouraged, and all the alter-
natives to final termination of parental rights must be explored. (§§ 361.5,
366 et seq.)

No interests of comparable importance devolve upon an outsider to the
parent-child relationship. *In re B. G.*, *supra*, expressly declined to hold that
nonparents who assume a parental role thereby become "parents" or "guard-
ians," with all the rights such a status implies. (11 Cal.3d at p. 693, fn. 21.)
Subsequent Court of Appeal decisions have confirmed
that even those who attain the status of de facto parenthood "are not equated
with . . . parents or guardians for purposes of dependency proceedings and
standing to participate does not give them all of the rights and preferences
accorded [parents or guardians]. [Citations.]. . . ." (*In re Rachael C.* (1991)
235 Cal.App.3d 1445, 1452 [1 Cal.Rptr.2d 473]; *In re Jody R.* (1990) 218
Cal.App.3d 1615, 1628 [267 Cal.Rptr. 746]; see Cal. Rules of Court, rule
1412(e).)[7]

The de facto parenthood doctrine simply recognizes that persons
who have provided a child with daily parental concern, affection, and care
over substantial time may develop legitimate interests and perspectives, and
may also present a custodial alternative, which should not be ignored in a
juvenile dependency proceeding. The standing accorded de facto parents has

[7]Under rule 1412(e), one accorded standing as a de facto parent may ". . . [¶] (1) Be
present at the hearing; [¶] (2) Be represented by retained counsel or, at the discretion of the
court, by appointed counsel; [and] [¶] (3) Present evidence." De facto parents are not entitled
to reunification services and cannot be required to participate in such services. (*In re Jody R.*,
*supra*, 218 Cal.App.3d 1615, 1628.)

no basis independent of these concerns. Moreover, as we said in *In re B. G.*, *supra*, the key to the privileged status of de facto parenthood is adherence to "the role of parent," both physical and psychological. (11 Cal.3d 679, 692-693; see also Cal. Rules of Court, rule 1401(a)(4).)

■ But as we have seen, any adult who causes the onset of dependency proceedings by committing sexual or other serious physical abuse upon a child in his charge has betrayed and abandoned, not embraced, "the role of parent." That adult has undermined, not "fulfill[ed,] the child's physical needs and his psychological need for care and affection." (*In re B. G.*, *supra*, 11 Cal.3d 679, 692, & fn. 18; Cal. Rules of Court, rule 1401(a)(4).) When the perpetrator is one who lacks the inherent rights of a parent, no legitimate interest remains which would entitle the perpetrator to share in legal decisions about the victim's future care and welfare which were made necessary by the misconduct. By acting in a manner so fundamentally inconsistent with the parental role, the perpetrator forfeits any opportunity to attain the legal status of de facto parent and its attendant privilege of participation and advocacy.

In reaching a contrary result, the instant Court of Appeal relied on a single prior decision, *In re Rachael C.*, *supra*, 235 Cal.App.3d 1445. There, a dependency petition alleged that amphetamine residues were discovered in the home of an infant child's unofficial caretakers, particularly on the child's dresser and bottle liners. The petition also asserted that the child's blood contained traces of amphetamines. Neither the absent mother nor the caretakers appeared at the jurisdictional hearing. The trial court found the allegations true and sustained the petition. Subsequently, the caretakers applied to participate in the dispositional hearing as de facto parents. After considering a psychological evaluation, the trial court denied standing, and the caretakers appealed that order. The Court of Appeal reversed, holding in essence that the misconduct of a child's nonparental caretaker is irrelevant to the interests and policies favoring the caretaker's limited right of participation in dispositional proceedings. (235 Cal.App.3d at pp. 1452-1454.)

We disagree. Once there is an adjudication that a child is within the jurisdiction of the juvenile court because a nonparental caretaker committed a substantial harm, such as sexual or other serious physical abuse, which is fundamentally at odds with "the role of parent," the perpetrator's "protectible interest" in dispositional decisions is extinguished. Moreover, the views and evidence the perpetrator might offer are, as a matter of law, insufficiently relevant to justify standing to participate in proceedings on that issue. By an intentional act, the perpetrator has rejected the function of ongoing parental nurturer which is crucial to the privilege of participation as a de facto parent.

Cherie's counsel suggests that excluding alleged nonparental molesters from participation will prevent them from defending against the allegations. However, the de facto parenthood doctrine never contemplated a nonparent's participation in that capacity at the *jurisdictional* stage of a dependency proceeding. (See *In re Rachael C., supra*, 235 Cal.App.3d 1445, 1454.) Cherie's concerns are exaggerated in any event. Here, Derrick's status as *Desiree*'s parent gave him the right to appear and be represented by counsel at the jurisdictional hearing (see §§ 332, subd. (e), 335, subd. (a), 336, subd. (e), 349); he did appear, called witnesses, and testified in his own defense at that proceeding. Moreover, whenever a parent faces family disruption because of allegations of child abuse by a live-in companion, the parent has the right, and will often have the incentive, to call the alleged abuser to the stand to contradict the petitioner's claims. But at bottom, it is the parent, not the outsider, who retains the essential and basic right to decide how to respond to the state's intervention.[8]

Cherie's counsel also argues that by denying de facto parenthood standing to live-in nonparental abusers such as Derrick, we will discourage the reunification of nontraditional families. Citing the record below, as well as a plethora of professional authorities, Derrick has made related claims that it may sometimes be in the child's best interest to reunite with a nonparental abuser.

As we have seen, however, the law's strong support for preservation of the parent-child relationship, even in the face of dangerous parental misconduct, is based on factors unique to that relationship. An abusive nonparent, even one who had assumed a domestic custodial role, has no similar independent legal interest in the victim which would entitle the abuser to full participation in dependency proceedings. If parties properly before the court believe there are reasons to encourage reunification, they are free to present such concerns. The nonparental abuser's absence as a formal participant does not preclude the juvenile court from assessing such matters when deciding what disposition is in the child's best interest.

All we decide today is that a nonparent who commits sexual or other serious physical abuse upon a child in his or her charge thereby abandons the

---

[8]We recognize that dependency cases may occasionally arise in which no parent or legal guardian appears or is directly involved. An example is *In re Rachael C., supra*, 235 Cal.App.3d 1445, where the mother had disappeared and the dependency petition was directed solely at abuse by the child's unofficial caretakers. (See § 300, subd. (g).) We need not here decide what procedures might be desirable under such circumstances to ensure a full evidentiary record about factual disputes material to jurisdiction. Of course, the petitioner has the burden of proof on the jurisdictional allegations. (See §§ 350, subd. (c), 355.) Moreover, the juvenile court has power to "control all proceedings . . . with a view to the expeditious and effective ascertainment of the jurisdictional facts . . . ." (§ 350, subd. (a)(1).)

function of care, affection, and psychological fulfillment essential to the role of a de facto parent. When a juvenile court has found that the nonparent commmitted such abuse, and has therefore deemed it necessary to make the victim a dependent of the court, the abuser is barred from intervening in the same proceeding under the de facto parenthood doctrine. The abuser forfeits the opportunity to appear as a party, be represented, and give evidence about disposition in a dependency proceeding caused by the misconduct. To the extent reasoning in *In re Rachael C.*, *supra*, 235 Cal.App.3d 1445, implies the contrary, it is disapproved.

Our analysis makes it unnecessary to address the County's alternative argument that the trial court improperly absolved Derrick of the burden of proof on the issue of psychological parenthood. We also need not consider the County's suggestion that Derrick forfeited de facto parent status by failing to prove he provided Kieshia a home with a "wholesome and stable environment" (see *In re B. G.*, *supra*, 11 Cal.3d 679, 693, citing Civ. Code, § 4600, subd. (b)(2)).[9]

## CONCLUSION

The judgment of the Court of Appeal is reversed.

Lucas, C. J., Mosk, J., Panelli, J., Arabian, J., and George, J., concurred.

**KENNARD, J.,** Dissenting.—In *In re B. G.* (1974) 11 Cal.3d 679 [114 Cal.Rptr. 444, 523 P.2d 244], this court established that a "de facto" or psychological parent may be a party in child custody and dependency cases. In child dependency cases, de facto parent status merely entitles the psychological parent to be present at hearings with counsel and to introduce relevant evidence that may illuminate the trial court's decisionmaking process. (Cal. Rules of Court, rule 1412(e).) In this case, the majority holds that a trial court has no authority to allow a psychological parent whose physical or sexual abuse of a child is a cause of dependency proceedings to be heard as a party in dependency proceedings.

Whether a psychological parent who has committed acts of physical or sexual abuse of a child should be heard as a party in child dependency cases

---

[9]The County also mounts a broad general attack on the doctrine of de facto parenthood. In the County's view, Court of Appeal decisions since *In re B. G.*, *supra*, have construed the doctrine too liberally, and juvenile courts' efforts to apply it thus cause difficulty and wasted time which our original decision did not foresee. (See 11 Cal.3d at p. 692, fn. 18.) The County urges us to reexamine the principles set forth in *In re B. G.*, *supra*, and to set stricter general standards for their application. We consider these matters to be beyond the legitimate scope of the issues presented by the instant case, and we decline to address them.

is an emotionally charged issue that evokes strong reactions in most people. But the purpose of child dependency proceedings is not to punish persons who have committed acts of abuse; it is to serve the child's best interests. And, as the uncontroverted expert evidence and the appellate court opinion in this case indicate, an absolute rule barring psychological parents who have committed acts of abuse from participation in dependency proceedings may impair the ability of trial courts to make fully informed decisions regarding the future of the children. A trial court can only benefit from having all the relevant information available to it to assist in determining what action to take to protect the child's best interests. Because I would not impair the power of trial courts in this sensitive and difficult area, I cannot join the majority's opinion. Accordingly, I dissent.

## BACKGROUND

Kieshia E. was born to Cherie Williams and Curtis E. in May 1987. In May 1989 Cherie and Kieshia began living with Derrick Chapple; Cherie and Derrick had another child, Desiree, in November 1989. In June 1991 the San Diego County Department of Social Services filed a jurisdictional petition alleging that Derrick had molested Kieshia; a "sibling" petition was also filed regarding Desiree. The evidence as to Kieshia's molestation by Derrick was conflicting; the trial court found the allegations true.

On November 26, 1991, the date of the dispositional hearing, Derrick applied to intervene as Kieshia's de facto parent, but the court deferred the application. The court declared the children to be dependents of the juvenile court, ordered Cherie and Curtis to participate in a reunification plan with respect to Kieshia, and directed Cherie and Derrick to participate in a reunification plan with respect to Desiree.

In December 1991 and January 1992, the trial court held a hearing on Derrick's application to intervene as a de facto parent of Kieshia. After hearing testimony and considering all the relevant facts and circumstances, the trial court granted Derrick's application for de facto parent status. Kieshia appealed, and the Court of Appeal affirmed in an unpublished opinion. This court then granted review.

## DISCUSSION

In *In re B. G.*, this court stated: "We use the term 'de facto parent' to refer to that person who, on a day-to-day basis, assumes the role of parent, seeking to fulfill both the child's physical needs and his psychological need for affection and care." (11 Cal.3d at p. 692, fn. 18.) We also stated: "The

juvenile court in a dispositional hearing must undertake 'a judicious appraisal of all available evidence bearing on the child's best interests' . . . . The presence of de facto parents will aid the court in that endeavor; the views of such persons who have experienced close day-to-day contact with the child deserve consideration; moreover, an award of custody to such de facto parents is often among the alternate dispositions which the court must evaluate." (*Id.* at p. 693.) The holding of *In re B. G.* is now reflected in California Rules of Court, rules 1401 and 1412.[1]

It is important to note that de facto parent status does *not* entitle a psychological parent to custody of the child, to visitation with the child, or to any degree of independent control over the child's destiny whatsoever. Nor does de facto parent status entitle a person to the reunification services that must generally be provided biological parents or legal guardians under the juvenile dependency law. (*In re Jamie G.* (1987) 196 Cal.App.3d 675, 684 [241 Cal.Rptr. 869].) As I observed earlier, de facto parent status merely entitles the psychological parent to be present at dependency hearings with counsel and to introduce relevant evidence that may assist the trial court in rendering a decision. (Cal. Rules of Court, rule 1412(e).) And "[i]f the information presented by the de facto parent is not helpful, the court need not give it much weight in the decisionmaking process." (*In re Patricia L.* (1992) 9 Cal.App.4th 61, 67 [11 Cal.Rptr.2d 631].)

The majority's rationale for denying de facto parent status to psychological parents who commit acts of physical or sexual child abuse is simple: "Once there is an adjudication that a child is within the jurisdiction of the juvenile court because a nonparental caretaker committed a substantial harm, such as sexual or other serious physical abuse, which is fundamentally at odds with 'the role of parent,' the perpetrator's 'protectible interest' in dispositional decisions is extinguished. . . . By an intentional act, the perpetrator has rejected the function of ongoing parental nurturer which is crucial to the privilege of participation as a de facto parent." (Maj. opn., *ante*, at p. 78.)

In my view, there are two serious problems with the majority opinion: (1) it makes unrealistic and simplistic assumptions about human nature and

---

[1]Rule 1401(a) of the California Rules of Court provides: "(4)  'De facto parent' means a person who has been found by the court to have assumed, on a day-to-day basis, the role of parent, fulfilling both the child's physical and psychological needs for care and affection, and who has assumed that role for a substantial period; . . ."

Rule 1412(e) states: "Upon a sufficient showing the court may recognize the child's present or previous custodians as de facto parents and grant standing to participate as parties in disposition hearings and any hearing thereafter at which the status of the dependent child is at issue. The de facto parent may: [¶] (1) Be present at the hearing; [¶] (2) Be represented by retained counsel or, at the discretion of the court, by appointed counsel; [¶] (3) Present evidence."

relationships; and (2) it misperceives the main purpose of de facto parent status.

First, it is clear that in the majority's view, once a psychological parent has committed an act of abuse, that person has so betrayed and abandoned the role of parent that he or she should be entirely barred from any further proceedings and, impliedly, any contact with the child; that person is "bad" and has nothing to offer. But human nature is not so simple.

This case is a good illustration. As the Court of Appeal stated in its unpublished opinion: "[T]he evidence supports the court's finding Derrick fulfilled Kieshia's physical and psychological needs for care and affection for a substantial period. . . . [I]n addition to providing Kieshia with food, clothing and housing for almost two years, Derrick acted like a father to her. Kieshia called Derrick 'daddy' and he took her places, provided emotional support for her and disciplined her. Kieshia's godmother saw the relationship . . . as positive. Derrick's sister considered Kieshia to be her niece and part of [her] family. According to Cherie, Kieshia considered Derrick to be her dad. Because Derrick assumed the role of parent on a day-to-day basis, the court properly granted him de facto parent status."

The Court of Appeal also noted that a psychologist, Dr. Raymond Murphy, testified that the "process by which a child comes to identify a psychological parent in his or her life [is] one which occurs over a period of months and years." The court went on to observe: "[T]he true finding of sexual molestation is not proof that the bond between Derrick and Kieshia has been destroyed. Indeed, Dr. Murphy testified that sexual abuse by a psychological parent would not necessarily destroy the psychological parent-child relationship and the child would continue to view that person as his or her psychological parent." (See generally *People* v. *Jeffers* (1987) 43 Cal.3d 984, 997 [239 Cal.Rptr. 886, 741 P.2d 1127].)

Thus, the fact that a psychological parent has been found by a preponderance of the evidence to have sexually abused a child does not render all contact between the psychological parent and the child necessarily harmful to the child, as the majority assumes. Instead, what may be called for, in at least some cases, is therapy for the psychological parent and reunification with the child when appropriate. Indeed, Kieshia's therapist testified that "if the abuser is a psychological parent, that person should be reintroduced slowly into the child's life, unless he or she is in denial or is not actively participating in a treatment program."

Second, the majority appears to view intervention by a psychological parent as some sort of reward for such parents when they are "good." This

misperceives the primary purpose of allowing psychological parents to intervene in dependency proceedings—to give the courts, through the participation of de facto parents, an important perspective on the best interests of the child. Although this court in *In re B. G.*, *supra*, 11 Cal.3d at page 693, did speak of allowing de facto parents intervener status "to assert and protect their own interest," the court also spoke of the aid to the court provided by the perspective of de facto parents (*ibid.*).

As the Court of Appeal stated in *In re Patricia L.*, *supra*, the considerations relevant to granting de facto status include: "whether (1) the child is 'psychologically bonded' to the adult; (2) the adult has assumed the role of a parent on a day-to[-]day basis for a substantial period of time; (3) the adult possesses information about the child unique from the other participants in the process; (4) the adult has regularly attended juvenile court hearings; and (5) a future proceeding may result in an order permanently foreclosing any future contact with the adult. . . . *Because a court can only benefit from having all relevant information, a court should liberally grant de facto parent status.*" (9 Cal.App.4th at pp. 66-67, italics added.)

Realistically, unless the child is removed from the physical custody of the other parent, in many cases further contact with the psychological parent is quite likely in any event. Even when a psychological parent has abused a child, the "simple fact that a person cares enough to seek and undertake to participate goes far to suggest that the court would profit by hearing [that person's] views as to the child's best interests . . . ." (*In re B. G.*, *supra*, 11 Cal.3d at p. 692, fn. 18.)

I do not suggest that a person who has engaged in systematic and continuous acts of abuse, and has shown scant concern for the child's physical and emotional needs, nevertheless has a "right" to be treated as the de facto parent of the child. But an act of abuse should not automatically disqualify a person from being a de facto parent when that person's behavior has in other respects been that of a loving, caring parent. The trial court's decision whether to confer de facto parent status should turn not on the "rights" of the adult but on the interests of the child, and its decision should not be overturned absent a clear showing that the court has abused its discretion. Here, the trial court reasonably concluded that, despite his abusive conduct, Derrick had assumed the role of parent to Kieshia, and that his input would be useful in determining the best placement for the child. I see no reason to disturb that finding, or to deny the trial court the power to treat Derrick as a de facto parent.

We should not lose sight of the primary purpose of dependency proceedings—to serve the best interests of the child. Because a psychological parent

who has abused a child may still be bonded with the child in important ways, and because excluding such a parent from participation may impair the trial court's ability to make a fully informed decision as to the child's future, I disagree with the majority that we should entirely foreclose all possibility that abusive psychological parents may participate in dependency proceedings.

In order to preserve the ability of trial courts to hear from all parties who may provide important information relevant to the best interests of children in dependency proceedings, I would affirm the judgment of the Court of Appeal.

On November 24, 1993, the opinion was modified to read as printed above.