Filed 11/20/14  P. v. Sims CA2/3
Received for posting 11/24/14

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>CHEVELLE JAMAL SIMS,<br><br>     Defendant and Appellant. | B238001<br><br>(Los Angeles County<br>Super. Ct. No. SA077244) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Katherine Mader, Judge.  Affirmed.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Eric E. Reynolds and Peggy Z. Huang, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Chevelle Jamal Sims appeals his convictions for second degree commercial burglary and grand theft. The trial court sentenced him to six years four months in prison. Sims contends the evidence was insufficient to support six of his convictions, and the trial court committed instructional error. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts*

Maria Kristin Samson and appellant Sims acted together to carry out a cash advance scheme, by which they managed to fraudulently obtain large cash sums from several Chase Bank branches. The evidence relevant to the issues presented on appeal established the following.

a. *The burglaries and thefts*

Samson, who was 19 years old at the time of trial, moved to the United States from the Philippines in March 2009, and lived in Virginia and New Jersey before moving to Los Angeles. She met appellant Sims in Los Angeles in January 2011, when they were introduced by a mutual acquaintance. Sims told Samson to call him about a job if she needed "fast money." When Samson asked what the job entailed, Sims replied that she just needed a "card" and an identification. Sims called Samson and sent her text messages thereafter, but she did not respond because she was not interested. However, Samson lost her job in March 2011 and faced numerous medical bills. She contacted Sims expressing interest in the "job."

On March 31, 2011, Sims picked Samson up in his pickup truck. Samson brought with her a Provident Bank Visa debit card linked to her closed New Jersey bank account, and also her Virginia identification card. Sims for the first time explained the nature of the "job." He had Samson speak on a cellular telephone with a man identified as "Cyrus," to whom Samson provided her identification information and Provident card information. Sims explained the scam to Samson as follows. He would drop her off at a Chase bank branch. She was to pretend to attempt to withdraw cash from the ATM using the Provident card. Then she was to enter the bank and explain to a Chase employee that

2

she needed a cash advance for $5,000 but had been unable to withdraw the money from the ATM. Next, she would ask to use the bank's phone to call a 1-888 telephone number Sims provided to her. Cyrus would answer her call, and she was to inquire about her inability to withdraw the cash. Cyrus would ask her for her credit card and identification information, purportedly for verification purposes, confirm her money was purportedly in the bank, and ask to speak to the Chase bank teller. Samson's job was to convince the Chase employee to talk to Cyrus, posing as a Provident bank employee. Samson would receive $1,200 of every $5,000 she was able to obtain. After the scam was complete, Samson was to report to Provident that her card had been stolen. Samson knew her Provident account was closed and that what she was doing was wrong.

After explaining the scheme, Sims drove Samson to a Chase bank downtown and told her he would park across the street and wait for her. Following their plan, Samson managed to obtain $5,000. Sims drove Samson to four or five more Chase bank branches, where their efforts were sometimes successful, sometimes not. After each stop, Samson returned to Sims's truck and gave him any money she had obtained, whereupon he gave her her share. By 6:00 p.m. Samson had amassed a share of $3,600. She and Sims agreed to meet the following Monday, April 4, 2011, to perpetrate the scheme at additional Chase branches.

Samson sent Sims several text messages in early April. Among them were the following. On April 3, 2011, Samson sent a message to Sims stating, "Hi. Just wanna— we were just going to go local tomorrow. Right? And I can go home after 6:00?" She subsequently sent another message asking if they could "do the work" on April 5, rather than April 4, because she had a conflict with a medical appointment. Samson sent Sims another message on April 4 asking what time they would meet, and if he knew whether her card was still "good." In yet another message, Samson told Sims she was serious, "really want[ed]" to work with him and "really need[ed] money."

On April 5, 2011, Sims again picked Samson up in his pickup truck. His girlfriend was in the truck as well. Sims took Samson to approximately six bank branches that morning, and obtained approximately $8,000, of which Samson kept $1,200 or more.

3

Before heading to their next target, Sims stopped at a U.S. Bank branch while Samson waited in the car.

That afternoon the duo attempted the scam for the last time at a Chase branch in El Segundo. The branch manager, Lekili Palmer, had received an e-mail sent to all regional Chase bank branches advising that a woman was making large, unauthorized cash advances. Samson entered the bank at approximately 2:00 p.m., and proceeded in the same fashion as previously, first speaking with a bank employee and then using the bank's phone to call Cyrus. However, Palmer, alerted to what was happening, called 911.

Unfortunately for Samson and Sims, a police station was located across the street from the bank and officers arrived within three to four minutes. They arrested Samson. Palmer spoke with Cyrus and, at the direction of an officer, falsely told him the transaction had been completed. Shortly thereafter, El Segundo police officers located and stopped Sims in his pickup truck two blocks from the bank. A woman was in the car with him. A large bundle of cash was in the driver's side door pocket. Police removed two cellular telephones from the driver's seat. Police were unable to determine who owned the phones.

Samson testified that she never attempted the scam on her own.

b. *The investigation*

Samson confessed to police and explained the scam to them. As part of a negotiated plea, Samson agreed to testify for the People.

Detective Eric Atkinson examined the cellular telephones found in Sims's truck. One of them contained the text messages from Samson. In addition to the messages testified to by Samson, Detective Atkinson identified an additional message that stated, "Sounds cool. I want to work on those days while it's good."

Other text messages on the same phone were from Cyrus. A text sent from Cyrus on April 5, 2011, at 12:39 p.m., had a series of numbers following "U.S. Bank." A second text message stated, "I want my money, cuz. Stop fucking playing with me."

4

Another text stated, "Cyrus.  No.  You got the money.  I just . . . [got] off the phone with that bank and spoke with the manager Maria.  So call me."

Chase fraud investigator Linda Kristman testified that she investigated a series of fraudulent cash advance withdrawals made at different Chase branches on March 31 and April 5, 2011.  The bank's surveillance videos showed Samson in the banks at the time of each of the transactions.  Electronic bank records showed that on March 31, 2011, Chase's Culver City and National and Barrington branches each disbursed $5,000 for an account bearing Samson's name, and the Pico/Doheny branch disbursed $3,000.  On April 5, 2011, Chase's Long Beach and Manhattan Beach branches each disbursed $5,000 from Samson's account.

U.S. Bank records showed a deposit of approximately $3,000 made at U.S. Bank's Manhattan Beach branch, to the account number listed in the April 5, 2011 text message from Cyrus, found on the cell phone taken from Sims's truck.  The name on the U.S. Bank account was Cyrus Ashford.

2. *Procedure*

Sims was tried twice.  His first trial ended in a mistrial after the jury deadlocked.  Upon retrial, the jury convicted Sims of six counts of second degree commercial burglary (Pen. Code, § 459)[1] and five counts of grand theft (§ 487, subd. (a)).  In a bifurcated proceeding the trial court found Sims had suffered prior "strike" convictions (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), but subsequently granted his *Romero* motion[2] to strike them.  The trial court sentenced Sims to a term of six years four months in prison.  It imposed a restitution fine, a suspended parole restitution fine, a court security fee, and a criminal conviction assessment, and ordered Sims to pay victim restitution in the amount of $19,455.  Sims appeals.

---

[1]     All further undesignated statutory references are to the Penal Code.

[2]     *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

DISCUSSION

1. *The evidence was sufficient to corroborate Samson's testimony.*

Sims contends his convictions for burglary and grand theft, arising from the March 31, 2011 offenses at the Culver City, National-Barrington, and Pico-Doheny Chase bank branches (counts 6, 7, 8, 9, 12, and 13), must be reversed because there was insufficient evidence to corroborate the testimony of his accomplice, Samson. We disagree.

a. *Applicable legal principles*

The applicable standard of review is well settled. In assessing a claim of insufficiency of the evidence, "we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Snow* (2003) 30 Cal.4th 43, 66; *People v. Elliott* (2012) 53 Cal.4th 535, 585.) We presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Medina* (2009) 46 Cal.4th 913, 919.) The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence. (*People v. Brown* (2014) 59 Cal.4th 86, 106.)

An accomplice is a person "who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111; *People v. Whalen* (2013) 56 Cal.4th 1, 55.) Samson was an accomplice as a matter of law, and the jury was so instructed.

Section 1111 provides that a conviction cannot be based on an accomplice's testimony unless that testimony is corroborated. "Corroborating evidence may be slight, entirely circumstantial, and entitled to little consideration when standing alone. [Citations.] It need not be sufficient to establish every element of the charged offense or to establish the precise facts to which the accomplice testified. [Citations.] It is 'sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' [Citation.]" (*People v. Valdez* (2012) 55

6

Cal.4th 82, 147-148; *People v. Chism* (2014) 58 Cal.4th 1266, 1301; *People v. Nelson* (2011) 51 Cal.4th 198, 218.) However, "it is not sufficient to merely connect a defendant with the accomplice or other persons participating in the crime. The evidence must connect the defendant with the crime, not simply with its perpetrators. [Citations.]" (*People v. Falconer* (1988) 201 Cal.App.3d 1540, 1543.) The corroborative evidence must connect defendant with the crimes without assistance from the accomplice's testimony. (*People v. Davis* (2005) 36 Cal.4th 510, 543.) The testimony of one accomplice is not sufficient to corroborate the testimony of another. (*Id.* at pp. 543-544.) The trier of fact's determination on the issue of corroboration is binding on the reviewing court unless the evidence should not have been admitted, or does not reasonably tend to connect the defendant with the commission of the crime. (*People v. McDermott* (2002) 28 Cal.4th 946, 986; *People v. Narvaez* (2002) 104 Cal.App.4th 1295, 1303.)

       b. *Application here*

Contrary to Sims's contention, the evidence was sufficient to corroborate Samson's testimony. Samson testified that she sent Sims a number of text messages in early April regarding their participation in the scheme. Atkinson examined two cell phones found in the driver's seat of Sims's car, and discovered the text messages on one of them. The content of the messages did more than simply link Sims with Samson; they linked him to the crimes. (See *People v. Beaver* (2010) 186 Cal.App.4th 107, 115 ["while corroborating evidence need only be slight, 'it is not sufficient to merely connect a defendant with the accomplice or other persons participating in the crime. The evidence must connect the defendant with the crime' "].) The text messages included: (1) the statement that Samson "really want[ed] to work with you, and I really need money"; (2) the query, "Do you know until when my card is good?"; and (3) several messages confirming or changing the dates and times they would meet to "do the work." The messages were from "Kristin," Samson's middle name, and were sent on April 4 and 5, 2011, shortly after the first set of offenses and shortly before the second.

Samson also testified regarding Cyrus's participation in the scheme: He was the person who posed as a Provident Bank employee to facilitate the scam. The detective's

discovery of various text messages on the cell phone from Cyrus were damning. One stated, "You got the money. I just . . . [got] off the phone with that bank and spoke with the manager Maria. So call me." Another stated, "I want my money, cuz. Stop fucking playing with me." And another, sent on April 5, 2011, at 12:39 p.m.—a time in between the thefts carried out that day—included the notation "U.S. Bank" and a number determined to be that of an account owned by Cyrus Ashford. These messages clearly linked Sims with the crimes.

In arguing to the contrary, Sims makes three points, none of which persuade us. First, he avers that the text message evidence suffers from the "critical flaw" that the phone was never definitively shown to be his. He urges that there was no evidence he owned or used the phone; it might have belonged to his female passenger; and the messages were not addressed to him by name. But corroborating evidence may be circumstantial, and slight. (*People v. Valdez, supra,* 55 Cal.4th at pp. 147-148; *People v. Whalen, supra,* 56 Cal.4th at p. 55.) It was a reasonable inference that a phone found in the driver's seat of the truck Sims was driving belonged to, or at least was being used by, him. Therefore it was also reasonable to infer that the text messages from both Cyrus and Samson were directed to him.

Second, Sims urges that evidence he was involved in a scheme on April 5, 2011 "does not create a logical inference . . . he was involved on a prior date." On the facts of this case, we disagree. Samson's testimony that Cyrus assisted in perpetrating the crimes on both dates was sufficiently corroborated by the text messages from Cyrus demonstrating his involvement in the scheme. Videotapes from the banks showed that the offenses on both dates were committed by Samson, who defrauded Chase bank branches—and only Chase bank branches—by making large cash withdrawals in all the crimes, leading to the inference that the offenses were all part of a single ongoing scheme covering both dates. To some extent, the tenor of the text messages suggested an ongoing relationship. Corroborating evidence " ' "is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth." [Citation.]' " (*People v. Whalen, supra,* 56 Cal.4th at p. 55; *People v. Valdez,*

8

*supra,* 55 Cal.4th at p. 148.)  That standard was met here as to both dates.

Third, Sims contends that there was "no independent evidence that [he] was an integral part of the scheme."  He argues that there was no corroboration that he drove Samson to the banks, or masterminded the scam.  However, it is well settled that corroborating evidence need not be sufficient to establish every element of the offense, or every fact to which the accomplice testifies.  (*People v. Whalen, supra,* 56 Cal.4th at p. 55; *People v. Valdez, supra,* 55 Cal.4th at pp. 147-148.)  The evidence was sufficient.[3]

2.  *Instructional error*

a.  *Instructions on uncharged conspiracy*

Sims's jury was instructed on two theories of liability:  aiding and abetting, and uncharged conspiracy.  In regard to the latter theory, the trial court gave CALCRIM Nos. 416 (evidence of uncharged conspiracy), 417 (liability for coconspirators' acts), 418 (coconspirator's statements), 419 (acts committed or statements made before joining conspiracy), and 420 (withdrawal from conspiracy).  Sims urges that this was reversible error because "conspiracy is not a valid theory of criminal liability in California."  He contends that the Legislature has defined conspiracy as a substantive offense, not a theory of vicarious liability.  In his view, cases holding a defendant may be found guilty of an offense on an uncharged conspiracy theory conflict with section 31, which defines principals to a crime and does not mention coconspirators.  While acknowledging that cases since at least 1907 have recognized conspiracy as a theory of liability in California, Sims nonetheless avers that this rule is an unwarranted enlargement of section 31.

Sims's arguments are foreclosed by the decisions of our Supreme Court, which has repeatedly held conspiracy is a valid theory of liability.  In *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, the defendants challenged the prosecutor's use of uncharged conspiracy as a theory of derivative liability.  (*Id.* at p. 1200.)  The court explained:

---

[3]    In light of our resolution of this issue, we need not reach the parties' arguments regarding recalculation of joint and several liability, a question which would arise only if Sims's convictions for the March 31 offenses were reversed.

9

"Conspiracy can itself be the basis of derivative liability quite apart from aiding and abetting principles. 'It is long and firmly established that an uncharged conspiracy may properly be used to prove criminal liability for acts of a coconspirator. [Citations.] "Failure to charge conspiracy as a separate offense does not preclude the People from proving that those substantive offenses which are charged were committed in furtherance of a criminal conspiracy [citation]; nor, it follows, does it preclude the giving of jury instructions based on a conspiracy theory [citations]." [Citation.]' . . . Contrary to [defendant's] assertion, use of an uncharged conspiracy does not violate state law, even though the statutory definition of 'principals' set forth in section 31 does not include conspirators." (*Id.* at pp. 1200-1201.) Accordingly, the court "reject[ed] defendants' claim that the prosecution's use of an uncharged conspiracy as a basis of derivative liability was impermissible." (*Id.* at p. 1203; see also, e.g., *People v. Valdez, supra,* 55 Cal.4th at p. 150 ["[o]ur decisions have 'long and firmly established that an uncharged conspiracy may properly be used to prove criminal liability for acts of a coconspirator"]; *In re Hardy* (2007) 41 Cal.4th 977, 1025 ["One who conspires with others to commit a felony is guilty as a principal. (§ 31.)"]; *People v. Mohamed* (2011) 201 Cal.App.4th 515, 523-524.) The same result is required here. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

b. *Instructions on theft and burglary*

Sims was charged in counts 1, 2, 4, 6, 8, and 12 with second degree commercial burglary, and in counts 3, 5, 7, 9, and 13 with grand theft. Sims urges the trial court erred by (1) failing to instruct on the elements of theft; (2) misstating the dollar amount required to prove grand theft, and (3) informing the jury theft was a general intent crime. We agree the court erred, but conclude the errors were harmless.

(i) *Additional facts*

The trial court instructed as follows. It gave CALCRIM No. 1700, on commercial burglary. That instruction stated, in pertinent part, that to prove Sims guilty, the People were required to establish: "1. The defendant entered a building; [¶] AND [¶] 2. When he/she entered a building, he/she intended to commit theft. [¶] To decide whether the

10

defendant intended to commit theft, please refer to the separate instructions that I will give/have given you on that crime[]. [¶] If you find the defendant guilty of burglary, it is burglary of the second degree. [¶] A burglary was committed if the defendant entered with the intent to commit theft. The defendant does not need to have actually committed theft . . . as long as he/she entered with the intent to do so."

The only instruction provided on the offense of theft was an excerpt of CALCRIM No. 1801, which stated in pertinent part: "If you conclude that the defendant committed a theft, you must decide whether the crime was grand theft or petty theft. [¶] The defendant committed grand theft if he stole property or services worth more than $400. [¶] All other theft is petty theft. [¶] The People have the burden of proving beyond a reasonable doubt that the theft was grand theft rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of grand theft."

The court also gave CALCRIM No. 252, regarding general and specific intent. As given, the instruction stated that the crime of grand theft requires "general criminal intent," and burglary required specific intent. It defined the specific intent for burglary thus: "[the] person must not only intentionally commit the prohibited act or intentionally fail to do the required act, but must do so with a specific intent. The act and the specific intent required are explained in the instruction for that crime or allegation."

The jury was also instructed on principles relevant to aiding and abetting and conspiracy.

(ii) *Applicable legal principles*

A trial court must instruct, sua sponte, on the general principles of law relevant to and governing the case, including instructions on all of the elements of a charged offense. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1311; *People v. Haraszewski* (2012) 203 Cal.App.4th 924, 936; *People v. Gerber* (2011) 196 Cal.App.4th 368, 390.) Errors in jury instructions are questions of law, which we review de novo. (*People v. Jandres* (2014) 226 Cal.App.4th 340, 358.)

An instructional error that omits an element of the offense generally is not structural error requiring automatic reversal. Instead, it is reviewed under the harmless

11

error standard of *Chapman v. California* (1967) 386 U.S. 18, 24. (*People v. Gonzalez* (2012) 54 Cal.4th 643, 662-663; *People v. Haraszewski, supra,* 203 Cal.App.4th at p. 936.) Under the *Chapman* standard, " 'an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' " (*Haraszewski*, at p. 936; *Gonzalez,* at pp. 662-663.)

There is a "clear distinction between instructional error that entirely precludes jury consideration of an element of an offense and that which affects only an aspect of an element." (*People v. Cummings, supra,* 4 Cal.4th at p. 1315.) An instructional error that withdraws from the jury consideration of substantially all of the elements of an offense is reversible per se, unless other instructions required that the jury "find the existence of the facts necessary to a conclusion that the omitted element had been proved." (*Ibid.*; *People v. Mil* (2012) 53 Cal.4th 400, 413.)

(iii) *Forfeiture*

The People contend that Sims has forfeited any appellate challenge to the instructions because he failed to object to them below. This contention is meritless. As noted, a trial court has a sua sponte duty to instruct on the general principles of law relevant to the evidence. Accordingly, there is no forfeiture. (*People v. Mil, supra,* 53 Cal.4th at p. 409 ["it is well settled that no objection is required to preserve a claim for appellate review that the jury instructions omitted an essential element of the charge"]; *People v. Gerber, supra,* 196 Cal.App.4th at p. 390.) Moreover, we may review Sims's claims of instructional error pursuant to section 1259 ["The appellate court may . . . review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby"].)

(iv) *The burglary instructions*

Burglary is the entry into any building with the intent to commit grand or petty larceny or any felony. (§ 459; e.g., *People v. Smith* (2006) 142 Cal.App.4th 923, 929.) In a burglary case, the trial court, on its own initiative, must identify and define the

12

elements of the target offenses the defendant allegedly intended to commit upon entry into the building. (*People v. Hughes* (2002) 27 Cal.4th 287, 349; *People v. Rathert* (2000) 24 Cal.4th 200, 204 ["In a burglary prosecution, complete and accurate jury instructions include the definition of each felony the defendant is alleged to have intended to commit upon entry into the burglarized structure"].) "The duty to define such so-called target offenses and instruct on their elements has become well established." (*Hughes,* at p. 349.) Here, the court's burglary instruction identified the target offense—theft—but did not instruct on the elements of theft, except to state, in CALCRIM No. 1801, that Sims committed grand theft if he "*stole* property or services." (Italics added.) Similarly, the court has a sua sponte duty to instruct on the elements of the offense alleged to be the target of the conspiracy. (*People v. Cook* (2001) 91 Cal.App.4th 910, 918.) The court here instructed that theft and burglary were targets of the conspiracy, but did not further define the elements of theft.

However, the court's misstep was harmless beyond a reasonable doubt as to the burglary counts. (See *People v. Hughes, supra,* 27 Cal.4th at p. 352 [applying the *Chapman* standard to a failure to instruct on the elements of target offenses].) This court addressed the issue over 70 years ago in *People v. Corral* (1943) 60 Cal.App.2d 66. There, the defendant shoplifted clothing from a large department store, and was charged with second degree burglary. The trial court instructed on burglary using the language of section 459, that is, that every person who enters a building with the intent to commit theft or any felony is guilty of burglary. (*Corral*, at pp. 71-72.) The court did not give further instructions defining theft. The defendant argued that the statutory definition of theft included several different acts, and the absence of instruction on the elements left the jury "in ignorance of the precise nature" of the requisite intent. (*Id.* at p. 72.) *Corral* rejected this contention, reasoning: "It may well be that in some cases of burglary such an argument would be well taken, but this is not one of them. Only one sort of theft— larceny—was indicated by the evidence, and the showing of defendant's intent to commit that crime is so clear that we do not see how the jury could have had any doubt about it, or misunderstood the instruction. [Citation.] Even if such an instruction should properly

13

have been given here, its absence has not resulted in a miscarriage of justice." (*Ibid*.)

The same is true here. This was not a case in which the jury could have speculated about which of several crimes Samson intended to commit when she entered the banks. The People did not advance multiple theories regarding what crime Samson intended. Indeed, that Samson intended to, and did, commit theft was undisputed. The key question for the jury was whether Sims was Samson's accomplice or coconspirator. Having found that he was, the jury could not possibly have concluded he lacked the intent to commit felony theft, or that he intended Samson to commit some crime other than theft when she entered the banks.

*People v. Failla* (1966) 64 Cal.2d 560, does not compel a different result. In *Failla,* the court instructed the jury that one who enters an apartment with the "intent to commit theft '*or any felony*' " is guilty of burglary. (*Id*. at p. 564, italics added.) This was held to be prejudicial error. Distinguishing *People v. Corral, supra,* 60 Cal.App.2d 66, *Failla* reasoned: "[W]here the evidence permits an inference that the defendant at the time of entry intended to commit one or more felonies and also an inference that his intent was merely to commit one or more misdemeanors or acts not punishable as crimes, the court must define 'felony' and must instruct the jury which acts, among those which the jury could infer the defendant intended to commit, amount to felonies. Failure to do so is error, for it allows the triers of fact to indulge in unguided speculation as to what kinds of criminal conduct are serious enough to warrant punishment as felonies and incorporation into the burglary statute." (*Failla*, at p. 564.)

Unlike in *Failla,* here the evidence did not permit an inference that Samson entered the banks intending only a misdemeanor, non-criminal conduct, or a crime other than theft. Accordingly, *Failla* is inapplicable. (See *People v. Parson* (2008) 44 Cal.4th 332, 354 ["This is not a case where the claimed intended conduct arguably did not amount to criminal theft"].) "Unlike the situation in *Failla* . . . , the burglary instructions in this case did not contain ambiguous language referring to 'any other felony.' And here, the evidence was such that when defendant entered [the dwelling], he intended to commit no crime other than theft or robbery." (*Ibid.*)

14

Moreover, "theft" is a commonly understood word, and there is little if any difference between the legal definition of theft and the commonplace understanding of the crime. "The elements of theft by larceny are: (1) the defendant took possession of personal property owned by someone else; (2) the defendant did so without the owner's consent; (3) when the defendant took the property, he or she intended to deprive the owner of it permanently; and (4) the defendant moved the property, even a small distance, and kept it for any period of time, however brief." (*People v. Catley* (2007) 148 Cal.App.4th 500, 505; CALCRIM No. 1800.) These elements are all conveyed by the words "theft" or "steal" without further elaboration. Webster's Dictionary defines theft as "the act of stealing," the "felonious taking and removing of personal property with intent to deprive the rightful owner of it." (Webster's 3d New Internat. Dict. (2002) p. 2369.) This commonly understood definition readily tracks the legal definition. Likewise, the word "steal" is commonly understood: "[I]t has long been recognized that 'steal' has a 'fixed and well-defined meaning, and is, perhaps, in its common, every-day use and general acceptation, as well understood as any word in the English language.' [Citation.]" (*People v. Parson, supra,* 44 Cal.4th at p. 352.) Thus, as a practical matter, the court's failure to define the elements of theft in regard to the burglary counts was insignificant on the facts of this case.

Sims argues that the error must have been prejudicial because the jury deadlocked at his first trial when properly instructed on theft, whereas it convicted him when the instruction was omitted. The People counter that other differences in the evidence and theories presented at the two trials accounted for the difference. We need not speculate on the reasons for the divergent verdicts, however. "Under the *Chapman* standard, 'an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' [Citation.]" (*People v. Haraszewski, supra,* 203 Cal.App.4th at p. 936.) Such is the case here.

15

(v) *The theft instructions*

The trial court committed three errors in regard to the jury instructions on grand theft. First, section 484, subdivision (a) defines theft, in pertinent part, as follows: "Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, . . . or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property, . . . is guilty of theft." As noted *ante,* the elements of theft by larceny are: (1) the defendant took possession of personal property owned by someone else; (2) the defendant did so without the owner's consent; (3) when the defendant took the property, he or she intended to deprive the owner of it permanently; and (4) the defendant moved the property, even a small distance, and kept it for any period of time, however brief. (*People v. Catley, supra,* 148 Cal.App.4th at p. 505; CALCRIM No. 1800.) The court failed to give CALCRIM No. 1800 or any other instruction that would have set forth these elements.

Second, the court wrongly informed the jury that grand theft is a general intent crime. In fact, theft is a specific intent crime, that is, it requires that the perpetrator have, at the time of the taking, the specific intent to permanently deprive the owner of the property. (*In re Jesus O.* (2007) 40 Cal.4th 859, 867; cf. *People v. Abilez* (2007) 41 Cal.4th 472, 510.)

Third, the court erroneously informed the jury that Sims was guilty of grand theft, as opposed to petty theft, if the value of the property stolen was over $400. Prior to January 1, 2011, section 487, subdivision (a) provided that a defendant committed grand theft if he or she stole property worth more than $400. (See Stats. 2009-2010 (2010 3d Ex. Sess.) ch. 28, § 17.) Effective January 1, 2011, the Legislature amended section 487, subdivision (a) to define grand theft as the taking of property worth more than $950. (Stats. 2010 (2010 Reg. Sess.) ch. 693, § 1; *People v. Wade* (2012) 204 Cal.App.4th 1142, 1150.) Sims's offenses were committed in March and April of 2011, after the date the higher threshold took effect.

16

A. *Were the instructional errors harmless?*

The court's erroneous advice that theft is a general intent crime was cured by the instructions given on aiding and abetting and conspiracy. As noted, Sims was only liable for the crimes as an aider and abettor or coconspirator. The jury was instructed, via CALCRIM No. 401, that to be liable as an aider and abettor, Sims had to know "that the perpetrator *intended to commit the crime*" and, "[b]efore or during the commission of the crime, the defendant *intended to aid and abet the perpetrator in committing the crime*." (Italics added.) The instruction reiterated: "Someone aids and abets a crime if he knows of the perpetrator's unlawful purpose and he *specifically intends to,* and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime." (Italics added.) Likewise the conspiracy instructions stated that to prove Sims was a member of "a conspiracy in [the] case," the People were required to establish, inter alia, that the "defendant *intended to agree and did agree* with one or more persons to commit burglary and theft" and "[a]t the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy *intended that one or more of them would commit* burglary and theft." (CALCRIM No. 416, italics added.) " 'It is well established in California that the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction. [Citations.] "[T]he fact that the necessary elements of a jury charge are to be found in two instructions rather than in one instruction does not, in itself, make the charge prejudicial." [Citation.] "The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole." [Citation.]' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 328.)

Likewise, the erroneous instruction on the threshold amount for grand theft was harmless under any standard. There was no dispute that Samson took well over $950 in each of the thefts. It is clear beyond a reasonable doubt that the jury would not have rendered a more favorable verdict for Sims had the instruction stated the correct amount of $950. (See *People v. Wilkins* (2013) 56 Cal.4th 333, 348 ["When the jury is 'misinstructed on an element of the offense . . . reversal . . . is required unless we are able

17

to conclude that the error was harmless beyond a reasonable doubt' "]; *Chapman v. California, supra,* 386 U.S. at p. 24.)

The omission of an instruction setting forth the elements of theft presents a much closer question. In *People v. Cummings, supra,* 4 Cal.4th 1233, one of the defendants was charged with numerous counts of robbery, attempted robbery, and conspiracy to commit robbery, based on seven separate incidents. (*Id.* at p. 1306.) Our Supreme Court concluded that reversal of the robbery-related counts was required because the trial court failed to instruct on the elements of robbery, other than the intent to permanently deprive the owner of property. (*Ibid.*) The People argued omission of the instruction was harmless because the evidence established all of the robberies were accomplished at gunpoint, the jury was instructed on the "intent to permanently deprive" element, and the defendant did not dispute that the offenses constituted robbery but instead challenged only the identification of himself as one of the robbers. (*Id.* at p. 1312.)

*Cummings* disagreed, noting that a "finding that property was taken with the intent to permanently deprive the owner does not compel a conclusion that the jury has found the facts necessary to establish the remaining elements of the offense." (*People v. Cummings*, *supra*, 4 Cal.4th at p. 1313.) The court found "a clear distinction between instructional error that entirely precludes jury consideration of an element of an offense and that which affects only an aspect of an element. Moreover, [no authority] suggests that a harmless error analysis may be applied to instructional error which withdraws from jury consideration substantially all of the elements of an offense and did not require by other instructions that the jury find the existence of the facts necessary to a conclusion that the omitted element had been proved." (*Id.* at p. 1315.) Therefore, "regardless of the merits of the People's argument that [the defendant] did not dispute the existence of the predicate facts and that the evidence overwhelmingly established all of the elements of robbery, attempted robbery, and conspiracy to commit robbery," the convictions had to be reversed. (*Ibid.*)

In *People v. Mil, supra,* 53 Cal.4th 400, our Supreme Court considered whether omission of two elements from a jury instruction was susceptible to harmless error

18

analysis.  In *Mil,* the jury convicted the defendant of first degree murder and made true findings on burglary-murder and robbery-murder special circumstances.  The instructions did not fully instruct on the elements of the special circumstances for a defendant who was not the actual killer, including the requirements that in the absence of a showing of intent to kill, a non-killer must have acted with reckless indifference to human life and as a major participant in the commission of the underlying felony.  (*Id.* at p. 405.)  The defendant argued that, although the omission of a single element is susceptible to a *Chapman* harmless error analysis, when, as in his case, two or more elements are omitted from the instructions, the error is reversible per se.  (*Id.* at p. 409.)

The court found a harmless error analysis permissible (although the instructional errors were prejudicial in that case).  (*People v. Mil, supra,* 53 Cal.4th at p. 405.)  The court observed that most constitutional errors can be harmless:  "[f]or example, the omission of an element of a charged offense or sentencing factor is harmless when 'the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error . . . .' " (*Id.* at p. 410.)  The court reasoned that omissions of more than one element may differ from the type of constitutional violations that infect the entire trial process, render a trial fundamentally unfair, and thus amount to structural error.  (*Id.* at pp. 410-411.)  "Where an instruction omits some elements of the offense . . . , but the elements were uncontested and supported by overwhelming evidence, it would not necessarily follow that the trial was fundamentally unfair or an unreliable vehicle for determining guilt . . . ." (*Id.* at p. 411.)  While establishing harmlessness may prove more difficult in the context of multiple omissions, "that is not a justification for a categorical rule forbidding an inquiry into prejudice." (*Id.* at p. 412.)  The court found the distinction between omission of one element and multiple elements overly artificial.  (*Id.* at pp. 412-413.)

The court reasoned:  "To be sure, the federal Constitution bars a court from directing a verdict for the prosecution in a criminal trial by jury.  [Citation.]  And our own case law has held that the omission of 'substantially all of the elements' of a charged offense is reversible per se.  (*People v. Cummings*[, *supra,* 4 Cal.4th at p. 1315].)  But

19

these limitations derive not from an arbitrary counting game, but from the effect of the omission on the function and importance of the jury trial guarantee. . . . [W]e do not foreclose the possibility that 'there may be some instances in which a trial court's instruction removing <u>an</u> issue from the jury's consideration will be the equivalent of failing to submit the entire case to the jury—an error that clearly would be a "structural" rather than a "trial" error.' [Citation.] *The critical inquiry, in our view, is not the <u>number</u> of omitted elements but the <u>nature</u> of the issues removed from the jury's consideration. Where the effect of the omission can be 'quantitatively assessed' in the context of the entire record* (and does not otherwise qualify as structural error), the failure to instruct on one or more elements is mere ' "trial error" ' and thus amenable to harmless-error review." (*People v. Mil, supra,* 53 Cal.4th at pp. 413-414.)

Harmonizing *Mil* and *Cummings* in regard to the particular facts of this case, we conclude omission of the theft instruction is harmless beyond a reasonable doubt. Sims was not tried as the direct perpetrator of the thefts, but as an aider and abettor or coconspirator. The court's instructions conveyed that the perpetrator, Samson, committed theft if she "stole property." As we have discussed, the aiding and abetting instructions told the jury that Sims could be guilty only if he knew Samson intended to commit the crimes and intended to aid and abet her. The conspiracy instructions likewise required, as an element, that Sims must have intended that one of the conspirators commit burglary and theft. As described *ante,* the concept of theft is commonly understood. There was no dispute that Samson committed the thefts; the evidence was overwhelming and uncontroverted. (See *People v. Mil, supra,* 53 Cal.4th at p. 411.) The only real question was whether Sims was her accomplice or coconspirator. Thus, the nature of the issues removed from the jury's consideration—whether Samson took the bank's property, without its consent, with the intent to permanently deprive the bank of it, moved the property at least a small distance, and kept it for a period of time, however brief—can be quantitatively assessed in the context of the entire record. (*Id.* at pp. 413-414.) To hold otherwise would amount to the drawing of an artificial line condemned by *Mil.*

20

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ALDRICH, J.


We concur:


KLEIN, P. J.


KITCHING, J.